**AFFIDAVIT OF SPECIAL AGENT MATTHEW FITZGERALD MARTENSEN
IN SUPPORT OF AN APPLICATION FOR A COMPLAINT**

I, Matthew Fitzgerald Martensen, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI")
since March 1, 2020.  I am assigned to the Lowell Resident Agency of the FBI's Boston
Division, where I investigate financial crimes, drug trafficking, violent gangs, and threats to life.
Before my current assignment, I attended the FBI academy in Quantico, Virginia for
approximately six months, where I received extensive training in federal criminal and
constitutional law, investigative methods, and evidence collection.  Before becoming an FBI
agent, I was a police officer with the Chicago Police Department for approximately two and a
half years and worked in financial accounting and public accounting for approximately five
years.  I am a graduate of Northern Illinois University, where I received my Bachelor of Science
in Accountancy and Master's in Accounting Science.

2.      I submit this affidavit in support of an application for a criminal complaint
charging JAMES JOSEPH COHEN with bank fraud, in violation of 18 U.S.C. § 1344, and for a
warrant to arrest COHEN.

3.      The facts in this affidavit come from my personal observations and review of
records, my training and experience, and information obtained from other agents and witnesses.
This affidavit is intended to show merely that there is sufficient probable cause for the requested
complaint and arrest warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE THAT FEDERAL CRIMES WERE COMMITTED

4.      For the reasons set forth below, there is probable cause to believe that between in
or about April 2020 and the present, COHEN committed bank fraud by submitting false
applications to financial institutions and to the Small Business Administration to obtain

1

pandemic-related relief funds.[1]

5.      At all times relevant to this affidavit, Newburyport Bank and North Shore Bank
were financial institutions within the meaning of 18 U.S.C. § 20.

*COHEN's Businesses*

6.      According to records from the Massachusetts Secretary of the Commonwealth
("MSC"):

        a.      On or about February 13, 2014, COHEN registered SARC INC.
("SARC") as a Massachusetts research and development domestic profit corporation.  COHEN is
listed as the Treasurer, Secretary, and Vice President of SARC.

        b.      On or about September 4, 2019, COHEN registered CEROMAZE INC.
("CEROMAZE") as a Massachusetts domestic profit corporation engaged in neurological
topological mapping and enervation.  COHEN is listed as the Treasurer, Chief Executive Officer,
Vice President, and Director of CEROMAZE.

*COHEN's Investors*

7.      Investor 1 is a 95-year-old resident of Dedham, Massachusetts.

8.      Investor 1 gave money to COHEN for use in COHEN's businesses, but Investor 1
was not an employee of either SARC or CEROMAZE.  COHEN listed Investor 1 as the
President and Director of SARC with the MSC.

9.      Investor 2 is a resident of Swampscott, Massachusetts.

10.     Investor 2 gave money to COHEN to use for CEROMAZE, but Investor 2 was
not an employee of either SARC or CEROMAZE.  COHEN listed Investor 2 as the President,

---

[1]COHEN has two prior federal convictions, including a 2005 conviction for bank fraud.
U.S. District Judge Morris Lasker sentenced COHEN, then known as Jamie Edelkind, to 60
months imprisonment and ordered him to pay more than $3.2 million in restitution, much of
which remains unpaid.  *See* 4-CR-10066-MEL (D. Mass.).
.

Secretary, and Director of CEROMAZE with the MSC.

*The Small Business Administration*

11.     The United States Small Business Administration ("SBA") was an agency of the executive branch of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.  As part of this effort, the SBA enabled and provided for loans, guaranteed by the government, through banks, credit unions, and other lenders.

*EIDL Loans and Cash Advance Grants*

12.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 to provide emergency financial assistance to Americans suffering from the economic effects of the COVID-19 pandemic.  Among other things, the CARES Act expanded the SBA's Economic Injury Disaster Loan ("EIDL") program to provide loans of up to $2 million to small businesses that suffered "substantial economic injury" from COVID-19.   The EIDL program required recipients to use EIDL funds only on certain business expenses, including payments of fixed business debts and payroll.

13.     EIDL funds were issued directly from the United States Treasury.  Applicants applied to the SBA via an online portal. The EIDL application process required applicants to provide information concerning the affected business, including the number of employees, gross revenues, and costs of goods sold in the 12 months prior to January 31, 2020, as well as information about the business owner.  Applicants electronically certified that the information provided was accurate.

14.     EIDL applicants could also request and receive up to $10,000 in EIDL Cash Advance Grants—$1,000 per employee for up to 10 employees—by checking a box in the online

EIDL application.  The applicant was not required to repay an EIDL Cash Advance Grant, even if (i) the SBA ultimately denied the EIDL application or (ii) the applicant ultimately declined the loan.

15.    The SBA relied on the information provided by the applicant to determine how much money the small business was eligible to receive in EIDL funds.

*The Paycheck Protection Program*

16.    The CARES Act also provided funding for forgivable loans to small businesses for job retention and certain other expenses through the Paycheck Protection Program ("PPP"). In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and to make certain affirmative certifications.  In the PPP loan application (SBA Form 2483), the small business, through its authorized representative, was required to state, among other things, (i) the number of individuals it employed and (ii) its average monthly payroll expenses. These figures were used to calculate the amount of a PPP loan the small business was eligible to receive.  In addition, businesses applying for a PPP loan were required to provide documentation of their payroll expenses.  Only gross wages and tips paid to employees, up to $100,000 per employee, were included in the calculation of the eligible amount of the loan.

17.    Participating lenders processed PPP loan applications.  If the lender approved a PPP loan application, it funded the PPP loan using its own money, but the loan was guaranteed by the SBA.  The lender transmitted data from the application to the SBA, including information about the borrower, the total amount of the loan, and the listed number of employees, in the course of processing the loan.

18.    PPP loans were required to be used to pay for certain expenses, including payroll

costs, mortgage interest, rent, and utilities, and were forgivable if used for these expenses within

a designated period of time and if a certain portion of the proceeds were applied toward payroll.

*Overview of the Scheme*

19.     As set forth in more detail below, between approximately April 2020 and January

2021, COHEN electronically submitted six false applications for COVID-19 relief loans that

misstated either SARC and CEROMAZE's revenues or the companies' payroll obligations:

| Date | Type of Loan | Lender | COHEN Business |
|---|---|---|---|
| 4/2/2020 | EIDL | SBA | SARC |
| 4/2/2020 | EIDL | SBA | CEROMAZE |
| 4/3/2020 | PPP | North Shore Bank | SARC |
| 4/3/2020 | PPP | Newburyport Bank | CEROMAZE |
| 1/22/2021 | PPP | North Shore Bank | SARC |
| 1/25/2021 | PPP | Newburyport Bank | CEROMAZE |

*False EIDL Applications*

20.     On or about April 2, 2020, COHEN submitted EIDL applications to the SBA on

behalf of SARC and CEROMAZE.  He made the following representations in the applications.

| Borrower | Listed Owner | Loan Amount | Employees | Gross Revenues for the 12 months prior to 1/31/20 |
|---|---|---|---|---|
| SARC | Investor 1 | $150,000 | 7 | $2,200,000 |
| CEROMAZE | COHEN & Investor 2 | $150,000 | 11 | $2,836,050 |

21.     Based on these representations, the SBA approved the applications, and on the

dates below, it disbursed the following EIDL funds.

| Date | Amount | Basis for SBA Disbursal |
|---|---|---|
| 4/24/2020 | $10,000 | EIDL Cash Advance Grant to CEROMAZE for 10 employees |
| 4/25/2020 | $7,000 | EIDL Cash Advance Grant to SARC for 7 employees |
| 5/31/2020 | $149,900 | EIDL loan to SARC |
| 6/2/2020 | $149,900 | EIDL loan to CEROMAZE |

22.     These loan applications, however, misrepresented each company's revenues. SARC bank records obtained from Citizens Bank and Santander Bank during the investigation do not show deposits indicating gross revenues of $2,200,000 in the twelve months prior to January 31, 2020.  Rather, SARC's bank records reflect no revenues from sales.

23.     CEROMAZE's bank records from Newburyport Bank for the 12 months prior to January 31, 2020 show no revenues at all, not the $2,836,050 in revenues that COHEN claimed. (As noted above, CEROMAZE was not even incorporated until September 4, 2019).

24.     The CEROMAZE bank records are corroborated by Investor 2, the listed co-owner of CEROMAZE, who advised the FBI that he did not believe that CEROMAZE had any revenues because as of July 2021, CEROMAZE was still in the research and development phase.

25.     There is accordingly probable cause to believe that COHEN's EIDL loan applications in April 2020 were fraudulent.

*False PPP Loan Applications*

26.     On or about the dates set forth below, COHEN submitted applications for PPP loans on behalf of SARC and CEROMAZE.  Each application claimed false numbers of employees and amounts of employee compensation for the year prior to the applications.

27.     COHEN electronically signed each of the four SARC and CEROMAZE applications, either in his own name or in the name of Investor 1, and certified that the information in the applications and the supporting documents was true and accurate.

28.     The PPP applications and supporting documents that COHEN submitted, and loans

disbursed, were as follows:

| Date | Entity | Year | Bank | Claimed Average Monthly Payroll (Prior Calendar Year) | Claimed Employees | Loan Amount |
|---|---|---|---|---|---|---|
| 4/3/20 | SARC | 2020 | North Shore Bank | $88,897 | 11 | $222,242 |
| 1/22/21 | SARC | 2021 | North Shore Bank | $92,341 | 14 | $230,853 |
| 4/3/20 | CEROMAZE | 2020 | Newburyport Bank | $137,574 | 11 | $177,200 |
| 1/25/21 | CEROMAZE | 2021 | Newburyport Bank | $100,259 | 16 | $250,647 |
| **Total** | | | | | | **$880,942** |

*False Statements in the SARC and CEROMAZE PPP Applications*

29.    In the 2020 SARC PPP Loan Application and support, COHEN made at least the following false claims:

      a.    COHEN claimed that SARC paid $225,000 in salary to Investor 1 in 2019. As noted below, in an interview, Investor 1 reported that he was an investor in SARC but did not receive any salary.  SARC bank records show no salary payments to Investor 1.

      b.    COHEN claimed that SARC paid $74,280.58 in salary in 2019 to a purported employee, PE 5.  In an interview, PE 5 stated that he did not work for and received no salary from SARC in 2019.  SARC bank records show no payments to PE 5 in 2019.

      c.    COHEN claimed $347,991.04 as salary paid to himself.  When he was interviewed, however, COHEN claimed that he did not receive any salary from SARC and that any payments he received were loans.  SARC bank records show no payments going to COHEN designated as wages or salary.

30.    In the 2021 SARC PPP Loan Application and support, COHEN made at least the following false claims:

      a.    COHEN claimed that SARC paid its employees a total of $95,750, $95,766.67, and $96,758.33 in the months of October, November and December 2020, respectively.  However, North Shore Bank records show no compensation paid to any of the 14 employees listed by SARC between October and December 2020.

31.    In the 2020 CEROMAZE PPP Loan Application and support, COHEN made at

least the following false claim:

    a.    COHEN falsely stated that CEROMAZE had an average monthly payroll for 2019 of $137,574 and that the company had 11 employees. In fact, CEROMAZE was not even incorporated until September 4, 2019, and its bank records reflect no salary paid to employees before April 2020.

32.    In the 2021 CEROMAZE PPP Loan Application and support, COHEN made at

least the following false claims:

    a.    COHEN stated that in 2020, CEROMAZE's average monthly payroll was $100,259, its total annual payroll was $1,203,110, and the company had 16 employees. In fact, Newburyport Bank and CEROMAZE payroll service records show that CEROMAZE paid only 5 of the 16 claimed employees, and paid only about $115,832 in total compensation that year—less than a tenth of what COHEN claimed in the loan application.

    b.    COHEN claimed that CEROMAZE paid $159,000 to Investor 2 in 2020. As noted below, Investor 2 reported that he received no salary from CEROMAZE.

    c.    COHEN claimed that CEROMAZE paid approximately $85,000 to PE 5 in 2020. As noted below, PE 5 reported that he did not receive any salary or compensation from CEROMAZE.

    d.    COHEN claimed that he paid purported employees—PE's 8, 9, and 11—a total of approximately $194,017 in compensation, when payroll records, bank records, and COHEN's own statement below demonstrate that PE's 8, 9, and 11 were not CEROMAZE employees during that time period.

*Interview of PE 5*

33.    On July 26, 2021, I interviewed PE 5 by phone. He reported, in substance and

among other things, the following:

    a.    Contrary to what COHEN claimed in the 2020 SARC PPP Loan Application, PE 5 did not receive the approximately $74,000 in 2019 from SARC.

    b.    Contrary to the claim in the 2021 CEROMAZE PPP Loan Application, CEROMAZE had not paid PE 5 approximately $85,000 in 2020. PE 5 was not familiar with CEROMAZE.

*Interview of Investor 1*

34.     On or about July 9, 2021, I interviewed Investor 1, who was falsely listed in the 2020 SARC PPP Loan Application as having received hundreds of thousands of dollars in salary in 2019.  Investor 1 reported, among other things, that he had not received any salary from any source for the last ten years.

*Interview of Investor 2*

35.     On July 27, 2021, I interviewed Investor 2, who, as noted above, was falsely listed in the 2021 CEROMAZE PPP Loan Application as receiving more than $100,000 in compensation from CEROMAZE in 2020.  Investor 2 reported, in substance and among other things, the following:

a.     Investor 2 was not on CEROMAZE's payroll and did not receive compensation of approximately $159,000 in 2020 from CEROMAZE.

b.     Investor 2 did not believe CEROMAZE had any revenue since it was still in the research and development phase.

c.     Investor 2 had not seen any of the documents relating to the EIDL and PPP loans for CEROMAZE.

*Interview of COHEN*

36.     On or about July 12, 2021, I interviewed COHEN.  I surreptitiously recorded the interview.  COHEN stated, in substance and among other things, the following:

a.     He put together, electronically signed, and filed the applications for the PPP and EIDL loans for SARC.

b.     Contrary to what COHEN stated in the 2020 SARC PPP Loan Application, SARC did not compensate Investor 1 as an employee.

c.     COHEN did not know whether SARC had generated revenue.

d.     The bank accounts for SARC, CEROMAZE and COHEN are held at Newburyport Bank.

      e.      COHEN took $6,000-$10,000 per month from SARC's accounts. COHEN claimed these amounts were loans from Investor 1, not payroll, and that he owed them to SARC.

During the course of the interview, I showed COHEN the payroll documentation supporting the 2021 CEROMAZE PPP Loan Application. COHEN identified the signature on the document as his own. COHEN confirmed that PE 5 and another purported employee, PE 2, were in fact working for Investor 1, not CEROMAZE, and that Investor 1 was not involved with CEROMAZE.

37.    I showed COHEN supporting documentation for the 2021 CEROMAZE PPP Loan Application, including its purported payroll for September 2020. When asked why certain employees (PE's 8, 9 and 11), for whom the bank and payroll records showed no payments, were still listed on the support, COHEN responded that it was improper. COHEN also stated that Investor 2 was not paid the amounts shown on the supporting documents submitted with the 2021 CEROMAZE PPP Loan Application. COHEN also stated he submitted the 2021 CEROMAZE PPP Loan Application on his own and that the application contained misleading statements.

*COHEN's Use of EIDL and PPP Funds*

38.    Bank and other financial records show that COHEN used the EIDL and PPP funds for purposes other than those stated in the loan applications, including, among others, to pay personal expenses and business loans, including approximately the following amounts:

      a.      $5,900 to a veterinarian;

      b.      $123,000 to American Express for business and personal expenses;

      c.      $9,000 to a resort lodge in Maine;

      d.      $36,000 in tuition payments;

      e.      $13,000 in car payments

f.      $101,000 for the mortgage and taxes for his residence; and

g.      $19,000 to the mother of his children;

39.    None of these payments appears to be consistent with the stated purpose of the

EIDL and PPP loans to SARC and CEROMAZE.

## CONCLUSION

40.    Based on the information set forth above, there is probable cause to believe that

between April 2020 and the present, JAMES JOSEPH COHEN committed bank fraud by

submitting false applications for PPP and EIDL loans on behalf of CEROMAZE and SARC.

Sworn to under the pains and penalties of perjury,

*Matthew F Martensen*

Matthew Fitzgerald Martensen
Special Agent, FBI

Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 this the 27th day of
September 2021



HONORABLE MARIANNE B. BOWLER
United States Magistrate Judge

11